UNITED STATES BANKRUPTCY COURT                    FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
_____
                                              :
In re                                         :      Chapter 11
                                              :
ENRON CORP., *et al*.,                        :      Case No. 01-16034 (AJG)
                                              :
            Debtors.                          :      (Confirmed Case)
                                              :
_____:
                                              :
THE OFFICIAL COMMITTEE OF                     :
UNSECURED CREDITORS OF ENRON                  :
CORP, *et al*., on behalf of ENRON CORP.,     :
                                              :
            Plaintiff,                        :
                                              :      Adv. Pro. No. 03-93624 (AJG)
            v.                                :
                                              :
CAROL WHALEN, EXECUTRIX OF                    :
THE ESTATE OF JOHN C. BAXTER,                 :
                                              :
            Defendant.                        :
_____:

OPINION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

A P P E A R A N C E S

MILBANK, TWEED, HADLEY & McCLOY LLP
Attorneys for the Plaintiff
1 Chase Manhattan Plaza
New York, NY 10005

            Susheel Kirpalani, Esq.
            Thomas A. Arena, Esq.
            Joshua K. Porter, Esq.
                 Of Counsel

DEWEY BALLANTINE LLP
Attorneys for the Defendant
1301 Avenue of the Americas
New York, NY 10019

Dianne Coffino, Esq.
Carey D. Schreiber, Esq.
Of Counsel

ASHBY & GEDDES
Attorneys for the Defendant
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899

James McC. Geddes, Esq.
Gregory A. Taylor, Esq.
Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

## I. INTRODUCTION

Before the Court is a motion (the "Motion") for summary judgment, or in the alternative,

partial summary judgment, in the above-referenced adversary proceeding, filed by the defendant

Carol Whalen ("Whalen"), executrix for the estate of John C. Baxter ("Baxter" and the "Baxter

Estate"). Having reviewed the parties' pleadings, and a hearing having been held on this matter,

the Court concludes that the Motion should be denied in part and granted in part.

## II. FACTUAL BACKGROUND

From September 1, 2000, to May 1, 2001, the debtor, Enron Corp. ("Enron"), employed

Baxter as its Vice Chairman and Chief Strategic Officer. Pursuant to his employment agreement

(the "Employment Agreement"), Baxter was entitled to a monthly salary in the amount of

$41,666.67. In addition, Baxter was eligible for an annual performance bonus – targeted at $1.3

million – and three distinct retention bonuses. Specifically, Enron was obligated to pay Baxter a

retention bonus in the amount of $500,000 on October 1, 2000, and retention bonuses in the

amount of $800,000 on February 1, 2001 (the "February 2001 Retention Bonus") and February

1, 2002. On January 31, 2001, Enron paid the February 2001 Retention Bonus and issued

payment in the amount of $487,200 (the "Baxter Transfer") – the difference having been
withheld for income tax purposes.

On May 1, 2001, Baxter resigned from his position as Vice Chairman and Chief Strategic
Officer, but continued to work with Enron under the terms of a Consulting Services Agreement
(the "Consulting Agreement"), which became effective that same day.  Per the Consulting
Agreement, Baxter was entitled to an initial signing bonus in the amount of $360,000 and a
monthly payment of $250,000, plus expenses.  Baxter continued in Enron's employ as a
consultant until November 1, 2001, on which date the Consulting Agreement was terminated.
However, Enron did not make any payments under the Consulting Agreement from June through
the termination of Baxter's employment.

Baxter subsequently passed away on January 25, 2002.  On April 8, 2002, the Baxter
Estate was admitted to probate in the County Probate Court for Fort Bend County, Texas (the
"Texas Probate Court"), and Whalen was named executrix of the estate.  As of the date of this
Opinion, that probate proceeding has not been closed.

## III. PROCEDURAL BACKGROUND

On December 2, 2001 (the "Petition Date"), and continuing thereafter, Enron and certain
of its affiliates and subsidiaries filed voluntary petitions for relief under chapter 11 of title 11 of
the United States Code (the "Bankruptcy Code") with the Court (the "Bankruptcy Proceeding").
As part of its ongoing efforts to recover improperly distributed assets, the Official Committee of
Unsecured Creditors (the "Creditors' Committee" or "Committee") filed the instant adversary
proceeding (the "Baxter Proceeding") on December 1, 2003, seeking to avoid the Baxter
Transfer as a preference under 11 U.S.C. § 547(b), as a fraudulent transfer under 11 U.S.C. §
548(a)(1)(B), and as a fraudulent transfer under N.Y. Deb. & Cred. Law §§ 270 – 281.  *See*

3

*Complaint to Avoid and Recover Transfers* ("Complaint"), Baxter Pro., Docket No. 1.  Whalen's

answer was filed in response on February 17, 2004.  *See Answer of Carol Whalen* ("Answer"),

Baxter Pro., Docket No. 5.

In light of the large number of avoidance actions Enron has filed, and the common issues

of fact and law implicated in all those actions, the Court subsequently issued the Order Granting

Joint Motion of Debtors and the Creditors' Committee for Entry of an Order Temporarily

Staying Avoidance Action Discovery (the "Avoidance Action Procedure Order") on November

18, 2004.[1]  Bankr. Pro., Docket No. 22012 (the effected actions are listed in Exhibit 1 to the

order).  On June 20, 2005, upon the motion of Enron and the Creditors' Committee, the Court

then entered an order consolidating the various avoidance actions for the purposes of litigating

insolvency-related issues (the "Insolvency Consolidation Order" and the "Insolvency

Proceeding") and providing for the appointment of a Defendants' Steering Committee.  Bankr.

Pro., Docket No. 26188.  Though the Insolvency Consolidation Order contemplated that all fact

and expert discovery would be completed by September 29, 2006, the parties have informed the

Court that, due to outstanding discovery-related issues, that deadline will not be met, and further,

that they are unable to estimate when discovery will be completed.  *Letter from Discovery

Committee Liaison Counsel*, March 27, 2006, Insolvency Pro., Docket No. 37.  A status

conference on this matter was held on September 22, 2006, and a new schedule has been adopted

by the parties which contemplates that fact discovery will be completed by December 1, 2006.

*Stipulation Signed on 9/22/2006*, Baxter Pro., Docket No. 27.

---

[1] *See, e.g., Enron Corp. v. Citigroup, Inc., et al.*, No. 03-9266 (Bankr. S.D.N.Y. 2003) (the "Megacomplaint");
*Enron Corp. v. J.P. Morgan Sec. Inc., et al*, No. 03-92677 (Bankr. S.D.N.Y. 2003); *Enron Corp. v. Massachusetts
Mut. Life Ins. Co., et al.*, No. 03-92682 (Bankr. S.D.N.Y. 2003) (together, with *J.P. Morgan*, the "Commercial Paper
Litigation").

Whalen filed the Motion on December 16, 2005.  Baxter Pro., Docket No. 14.  The

Creditors' Committee filed its response on March 3, 2006.  *Plaintiff's Memorandum of Law in*

*Opposition to Motion for Summary Judgment* ("Response"), Baxter Pro., Docket No. 18.

Whalen filed a Memorandum of Law in Further Support of the Motion on April 7, 2006

("Defendant's Response").  Baxter Pro., Docket No. 20.  A hearing was held on the Motion on

June 1, 2006.  *See Transcript of Hearing Held on June 1, 2006* ("Transcript"), Baxter Pro.,

Docket No. 24.

It should also be noted that the Court recently issued an opinion in a related matter

involving the same defendant that considered and resolved a number of the issues raised here.

*Enron Corp. v. Carol Whalen, Executrix of the Estate of John C. Baxter* (*In re Enron Corp*)

("*Whalen I*"), No. 04-02462, 2006 WL 2642102 (Bankr. S.D.N.Y. Sept. 15, 2006).

IV. JURISDICTION

This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F).  The Court has

postconfirmation jurisdiction under paragraph 60 of the Court's Order Confirming Supplemental

Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United

States Bankruptcy Code, and Related Relief (the "Plan"), dated July 15, 2004.  The Court has

subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and under the July 10, 1984, "Standing

Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the

Southern District of New York (Ward, Acting C.J.).

Whalen argues that the Court is barred by the so-called "probate exception" to federal

jurisdiction from exercising jurisdiction over this proceeding.  Whalen contends that Enron's

attempt to litigate and dispose of the Baxter Estate's assets impermissibly interferes with the

Texas Probate Court's administration of the Baxter Estate, and that the Court therefore does not

have subject matter jurisdiction to resolve this matter.  This argument was previously raised in
*Whalen I*, where the Court concluded that the probate exception only applied where two courts
exercised *in rem* jurisdiction over the same *res*.  *See Marshall v. Marshall*, 126 S.Ct. 1735, 1748,
164 L.Ed.2d 480 (2006).  Arguably, this proceeding presents exactly those circumstances
identified in *Marshall* and absent from *Whalen I*.  That is, here, unlike in *Whalen I*, the
Complaint explicitly seeks entry of judgment and an order "directing Defendant immediately to
pay the Plaintiff on behalf of Enron an amount equal to the Transfers pursuant to section 550(a)
of the Bankruptcy Code…."  *Complaint*, Baxter Pro., Docket No. 1, at 8.  However, the
Creditors' Committee withdrew at oral argument any claim for an order directing the Baxter
Estate to turn over any sum and stated that it would enforce any judgment received here in the
Texas probate proceedings.[2]  Accordingly, the Court concludes that the probate exception does
not bar its exercise of jurisdiction over this proceeding.

V. STANDARD OF REVIEW

        Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy
proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, states that summary
judgment should be granted if the record demonstrates that "there is no genuine issue as to any
material fact and that the moving party is entitled to judgment as a matter of law."  A fact is
"material" if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A "genuine issue" exists
where "the evidence is such that a reasonable jury could return a verdict for the non-moving

---

[2] The Court also notes that it is not clear that the probate exception would bar the Court from adjudicating the
remaining claims asserted in the Complaint even if the Committee had not withdrawn its cause of action under
section 550(a).  The probate exception only bars the exercise of subject matter jurisdiction over actions seeking to
dispose of the assets of a probate estate.  As the remaining claims set forth in the Complaint do not seek to dispose
of such assets, but only seek to adjudicate the parties' rights, the Court's subject matter jurisdiction over those
claims would not be affected by the dismissal of the Committee's section 550(a) claim for lack of subject matter
jurisdiction.

party." *Id.* "When the movant demonstrates through competent evidence that no material facts are genuinely in dispute, the non-movant must set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2nd Cir. 1990) (internal quotation omitted). *See also*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be "viewed in the light most favorable to the party opposing the motion." *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1352 (2nd Cir. 1994). Furthermore, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## VI. DISCUSSION

The Creditors' Committee sets forth in the Complaint three distinct causes of action. The Committee asserts first that the Baxter Transfer may be avoided as a preferential transfer to an insider under section 547(b) of the Code. Section 547 provides that a "transfer of an interest of the debtor in property" may be avoided where the transfer (1) was made to or for the benefit of a creditor, (2) was on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made on or within ninety days before the petition date, and (5) was for an amount greater than the creditor would have received under a Chapter 7 liquidation, if the transfer had not been made, and otherwise under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b) (2006). The Committee bears the burden of establishing each of these elements. 11 U.S.C § 547(g) (2006). The Committee also seeks to avoid the Baxter Transfer as a fraudulent conveyance under section 548 of the Code and under section 544 of the Code and sections 270 to 281 of the N.Y. Deb. & Cred. Law.

As an initial matter, the Court notes that Whalen has raised a legal argument in the

Motion that the Court previously addressed in *Whalen I*. Whalen suggests that the Committee

cannot, as a matter of law, establish that the Baxter Transfer was a "transfer of an interest of the

debtor in property." In particular, Whalen contends that the sum withheld for income tax

purposes was, consistent with the Supreme Court's decision in *Begier v. Internal Revenue*

*Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), held in statutory trust for the

benefit of the Internal Revenue Service, and therefore was not the property of the debtor at the

time the transfer was made. As noted, this argument was addressed in *Whalen I*, and the Court

here reiterates its conclusion that a transfer to the statutory trust may be avoided as a "transfer of

an interest of the debtor in property." *Whalen I*, 2006 WL 2642102, at *5.

A. PREFERENTIAL TRANSFER – ANTECEDENT DEBT

Whalen also argues that the Baxter Transfer cannot be avoided as a matter of law because

it was not made "for or on account of an antecedent debt owed by the debtor before such transfer

was made." 11 U.S.C. § 547(b)(2). As previously noted, Enron was obligated under the terms

of the Employment Agreement to pay the February 2001 Retention Bonus on February 1, 2001.

However, the Baxter Transfer, which putatively represented satisfaction of that obligation, was

itself made on January 31, 2001, one day prior. Noting, therefore, that payment was made before

the obligation became due, Whalen contends that the Baxter Transfer was not on account of an

"antecedent debt."

Whalen's legal argument in support of this logical supposition is fairly straightforward.

Whalen cites *G.G. Survivor Creditor Corp. v. Harari* (*In re G. Survivor Corp.*), 217 B.R. 433,

440 (Bankr. S.D.N.Y. 1998), for the proposition that an antecedent debt is one incurred before

the allegedly preferential transfer was made. ("Under § 547(b) of the Code, a debt is antecedent

if the debtor incurs it before making the alleged preferential transfer."); *See also* 4 *Collier on Bankruptcy* ¶ 547.03[4], at 547-35-36 (2005) ("[A] debt is antecedent if it is incurred before the transfer: the debt must have proceeded the transfer.").  Whalen then argues that a debt is incurred for the purposes of section 547(b)(2) "when [the debtor] becomes legally obligated to pay it." *Southmark Corp. v. Marley* (*In re Southmark Corp.*), 62 F.3d 104, 106 (5th Cir. 1995).  Citing Texas law, Whalen proceeds next to suggest that, under the terms of the Employment Agreement, the February 2001 Retention Bonus only vested and became payable – i.e. Enron became legally obligated to pay – on February 1, 2001, and that the debt was thus "incurred" on that date.  Whalen concludes, therefore, that as the Baxter Transfer was made on January 31, 2001, before the debt was "incurred," the Baxter Transfer was not made "on account of an antecedent debt" within the meaning of section 547(b)(2).

The Committee predictably rejects this argument, though the majority of its response is limited to distinguishing the cases upon which Whalen relies, offering contrary authority the Committee suggests is more relevant and persuasive, and repeatedly noting that the Baxter Transfer was made "***one day before*** the date provided in the Employment Agreement." *Response*, at 8 (emphasis in original).  To the extent that the Committee confronts the particulars of Whalen's argument, the Committee replies that the debt was incurred on January 31, 2001, rather than February 1, 2001, and presumably, therefore, before the Baxter Transfer was made – though neither party has presented any factual evidence as to the specific time of day at which the Baxter Transfer was made.[3]  *Response*, at 5 ("Mr. Baxter was still employed by Enron on January 31, 2001, and this obligation became due and was a 'debt' under the Bankruptcy

---

[3] Though the issue as to whether the Baxter Transfer was made on account of an antecedent debt could perhaps be resolved on factual and contractual, rather than legal, grounds – if, for example, the Baxter Transfer was made after the close of business on January 31, 2001 – *neither* party has offered any such factual evidence in support of its position or attempted to argue on such grounds.  The Court must, therefore, resolve the issue as it has been presented.

Code.").[4]  The Committee also briefly sketches a negative proof that obliquely hints at important considerations: "It cannot here be said that Enron's obligation to pay [the February 2001 Retention Bonus] arose at the time of the transfer.  Mr. Baxter was an employee up to and beyond February 1, 2001.  Accordingly, Mr. Baxter had a claim against Enron, whether matured or unmatured, for the amount of the [February 2001] Retention Bonus."  *Id.* at 8.

The Bankruptcy Code does not itself define the term "antecedent debt."  Whalen asserts, however, that "a litany of decisions, including decisions [from this district], addressing section 547(b)(2) have rendered its meaning beyond dispute."  Having reviewed the decisions cited by the parties and the relevant case law, the Court believes, to the contrary, that disagreements concerning the meaning of the phrase "antecedent debt" exist in the case law in spite of an ostensible consensus.  Not surprisingly, these doctrinal disagreements lay at the heart of the parties' dispute.  However, they are only in the case law: in the Court's opinion, the statutory text is alone sufficient to resolve this issue, and the debate in the case law is therefore largely irrelevant to the Court's final analysis.  Nonetheless, it is worth examining the case law to illustrate how this dispute arose and to lay the foundation for the Court's conclusions.

i. The Case Law

As Whalen did, most courts invariably cite to the same vague legal maxims: namely, that an "antecedent debt" is a debt incurred before the transfer was made, and a debt is "incurred" when the debtor becomes legally obligated to pay.  However, while seemingly definite, these principles only restate the key question, shifting the inquiry from the meaning of "antecedent debt" to the meaning of "legally obligated to pay."  Thus, courts can cite to the same axioms

---

[4] This argument is hardly developed, and the Committee does not offer, in fact, an alternative definition of "antecedent debt" or suggest why the obligation became due on January 31, 2001, rather than on February 1 as provided in the Employment Agreement.  The Committee appears to suggest that the debt became "due" on January 31, 2001, even though payment on that debt was not required until February 1, 2001.

while reaching irreconcilable results, each embracing a different understanding of "legally

obligated to pay."[5]  The principal question under this standard, obviously, is what sort of legal

obligation is required to create a debt for purposes of section 547, and to this question a range of

answers have been offered.

One key point must be noted at the outset.  Though the Court is here confronting section

547(b), as did a majority of the decisions that will be discussed, it should be recognized that the

"legally obligated to pay" standard apparently originated in connection with the "ordinary course

of business" defense set forth in section 547(c)(2).[6]  Section 547(c)(2) protects transfers made in

the ordinary course of business from the trustee's avoidance powers, which one court has

characterized as "transactions, which, although they are technically credit transactions, are not

intended to remain unpaid for a long time."  *Barash v. Public Finance Corporation*, 658 F.2d

504, 511 (7th Cir. 1981).  This provision has been significantly revised in successive

amendments to the Code, which explains the relevance of those decisions discussing section

547(c)(2) to the antecedent debt analysis under section 547(b).  Under the Code as originally

drafted, section 547(c)(2) additionally required that the transfer be made "not later than 45 days

---

[5] What is interesting to note, of course, is what is suggested by this reframing of the issue.  As would be expected, the predominate issue arising from the term "antecedent debt" concerns the creation of the debt; whether or not that creation preceded the transfer is generally an issue of fact and beyond dispute.  When a debt is created is obviously a principle question of bankruptcy law and the subject of much discussion.  However, in this area of law, the debate has developed independently to a large extent, likely as a result of the discussion having been framed in terms of legal obligations.  While that characterization is certainly true in part, the case law clearly shows that a debt under the Bankruptcy Code is not simply a legal obligation, particularly as that term is commonly understood.  As will be made clear, this misunderstanding lies at the root of the dispute here.

[6] As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005), Section 547(c)(2) provides that a transfer may not be avoided to the extent that such a transfer was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee and such transfer was made either (A) in the ordinary course of the debtor's and the transferee's financial affairs or business; or (B) in accordance with ordinary business terms."  As will discussed further later in this Opinion, the alternative structure of this amendment revised the previous mandatory structure, such that transferees could successfully invoke the defense if they demonstrated that the payment was made in either the objective course of ordinary business (how financial affairs are conducted in the industry) or the subjective course of ordinary business (how the debtor conducted its financial affairs).

after such debt was incurred."[7]  Thus, courts confronting this provision were forced to determine

when a debt is "incurred" for the purposes of the "ordinary course of business" defense.[8]  The

favored answer was that a debt is "incurred" under section 547(c)(2) "when a debtor first

becomes legally bound to pay."  *Barash*, 658 F.2d, at 510.[9]

    In applying section 547(c)(2), courts were forced to reconsider one of the more difficult

issues in preference litigation: the treatment of installment payments, such as interest payments

on a loan or rental payments for a lease.  This issue had long been a feature of bankruptcy law

and had given rise, in part, to the judicially created "current expense" doctrine.  *See* Kaye,

*Preferences Under the New Bankruptcy Code*, 54 Am.Bankr.L.J. 201-02 (1980) (noting that the

"current expense" doctrine applied to wages, rent, and general operational expenses); *see, e.g., In

re Barrett*, 6 Am.Bankr.Rep. 199 (S.D.N.Y. 1901) (holding that current rent payments are for

current consideration and therefore were not preferences).  The "current expense" doctrine, as

applied under the Bankruptcy Act, prior to the enactment of the Code, held that current business

expenses were not antecedent debts and therefore were not subject to avoidance.  Kaye, at 201-

02.  ("The 'current expense' rule, as it was known, also was predicated on the notion that current

---

[7] This requirement was subsequently eliminated in the 1984 amendments to the Code.  Though the Court will not discuss the issue in much detail, it is obvious that an instrumental analysis of the section 547(c)(2) case law that follows can reconcile those decisions with the section 547(b) case law to be discussed.

[8] Interestingly, the "antecedent debt" requirement expressed in section 547(b) preceded the 1978 Code, and could be found in section 60 of the Bankruptcy Act.  However, the Court has found little evidence that any prior discussion of section 60 informed subsequent discussions of sections 547(b) and 547 (c)(2); presumably, courts concluded that any prior discussions, if they existed, were of little relevance in light of the fact that the 1978 Code replaced, rather than amended, the Bankruptcy Act.

[9] *Barash* was likely one of the first, if not the first, cases involving the forty-five day requirement to reach the circuit level: the case was argued before the circuit panel on April 17, 1981, a little less than two years after the 1978 Code became effective.  Though it is unclear whether any competing standards developed previously or concurrently, it is clear that the *Barash* court's analysis was adopted in other jurisdictions without exception.  It is interesting to note in this regard that the *Barash* court did not adopt "legally obligated to pay" as its standard.  That phrase was, in fact, used alternatively to describe the court's favored standard that "the debt is incurred whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt."  *Id.* at 509 (quoting 4 Collier 547.38).  Though the Court has suspicions as to why the "legally obligated to pay" standard was favored over the "property interest" standard in subsequent decisions, it is sufficient to note that *Barash* is the apparent source of the "legally obligated to pay" standard.

expenses were not antecedent debt, and therefore payment of them was not preferential."). However, the "current expense" doctrine had arisen in response to the lack of a provision in the Bankruptcy Act protecting such expenses; upon the promulgation of the Code and section 547(c)(2), courts thus had to reconsider their previous treatment of current expenses. This reconsideration was of particular importance in regard to interest and rent payments. Whereas most current expenses are, as the court in *Barash* noted, "not intended to remain unpaid for a long time," and thus are generally "incurred" within forty-five days of payment, the same is not true of leases and loans. Most leases and loans are long-term contracts for which installment payments are due; such payments may be made months or years after the contract was signed. In the context of the forty-five day requirement under section 547(c)(2) then, courts were asked to determine when the debtor (invariably the tenant or borrower) "incurred" the debt for which the periodic payments were made.

More specifically, creditors argued that the debt was only "incurred" when payment became due and payable. In the context of the *Barash* standard, it was argued that "legally obligated to pay" is synonymous with "due." If one focuses on the "legal" character of the obligation, arguably the two concepts are synonymous: until a payment becomes past due, the creditor cannot enforce the contract and obtain judgment in a court of law, and therefore, there is no "legal" obligation to pay before the due date. Similarly, from the perspective of the nature of the obligation, if the payment is for a term, it is plausible to view the debt as accruing over the course of the term and only being incurred at the expiration of the term. The position that a debt is not "incurred" until it becomes due was adopted in a line of cases centered on *In re Mindy's*.[10]

---

[10] The following cases, save for *Mindy's*, all cite *Barash* approvingly and adopt the "legally obligated to pay" formulation. *Mindy's* itself cites directly to decisions applying the "current expense" rule to current rent payments. *Mindy's* itself, then, rested on less persuasive reasoning to the extent it relied on cases interpreting a superceded statute, the Bankruptcy Act.

*Carmac v. Zell* (*In re Mindy's*), 17 B.R. 177 (Bankr. S.D.Ohio 1982).  The Court in *Mindy's* held

that the debt for which monthly rental payments had been made was incurred and became "due

and payable as the lease term progressed and as the lessee occupied the premises…." *Id.* at 179.

Likewise, the Court in *In re White River* held that payments on an equipment lease were for

"debts [that] were incurred under the lease in monthly increments on the actual dates the rent was

due." *Bernstein v. RJL Leasing* (*In re White River Corp.*), 799 F.wd 631, 633 (10th Cir. 1986).

*See also, Thomas W. Garland, Inc. v. Nooney Co.* (*In re Thomas W. Garland, Inc.*), 28 B.R. 87

(Bankr. E.D.Mo. 1983).  This reasoning was also applied to monthly interest payments on a

prepayable promissory note in *In re Iowa Premium Service Co.*, where the Court reasoned that

since "the use of the money for another day is new consideration each day," "[t]here can be no

doubt that [the debtor] was not legally bound to pay interest when the note was executed; it had

no obligation to pay interest until it used the money." *Iowa Premium Service Co. v. First

National Bank in St. Louis* (*In re Iowa Premium Service Co.*), 695 F.2d 1109, 1111-12 (8th Cir.

1982).  In these cases, therefore, the courts adopted the *Barash* formulation that a debt is

incurred when the debtor becomes legally obligated to pay, and held that the debt was incurred

upon the date that payment was due.  As most businesses remit payment for due accounts within

forty-five days, these decisions thus had the effect of shielding rent and interest payments from

avoidance through the "ordinary course of business" defense.

The conclusion that a debt is "incurred" when it becomes due and payable was

subsequently applied to situations other than recurring installment payments.  The court in

*Nolden v. Van Dyke Seed Co.* (*In re Gold Coast Seed Co., Inc.*) was asked to determine, in

connection with an asserted section 547(c)(2) defense, when the debt created by a forward

commodities contract was created.  751 F.2d 118 (9th Cir. 1985).  Having cited *Barash* and the

14

"legally obligated to pay" standard, the court then questioned when payment was due under the
contract; the court did not consider an alternative understanding of "legally obligated to pay."
Noting that "[t]he contract itself did not specify when payment was due," the court applied the
relevant provisions of the Uniform Commercial Code, which "provide that in the absence of a
contrary agreement, a seller is entitled to payment upon shipment of conforming goods." *Id.* at
1119. Thus, the court held, "a debt is incurred for purposes of 11 U.S.C. § 547(c)(2) when goods
are shipped…." *Id.*

More important for current purposes is the migration of the reasoning and conclusions
described above to the "antecedent debt" requirement of section 547(b). This extension was not
surprising given the similarity between the questions posed by sections 547(b) and 547(c)(2): in
both contexts, courts are asked to determine the date upon which the debt first arose. The
simplest example of this migration can be found in *Friedman v. Ginsburg* (*In re David Jones
Builder, Inc.*), 129 B.R. 682 (Bankr. S.D.Fla. 1991). In *David Jones Builder*, the court
considered whether interest payments made on a prepayable promissory note and made before
the due date were "on account of antecedent debt" within the meaning of section 547(b). The
key issue was obviously whether the interest debt arose on the due date or some other date,
namely the date of the note. The court specifically declined to hold that the debt was incurred on
the date on which the note was signed, noting that such a holding "would automatically render
even timely interest payments to be payments on an antecedent debt." *Id.* at 689. Instead, the
court favorably cited *Iowa Premium Service* and held that the interest debt arose on the due date.
*Id.* at 688-89. Thus, the court concluded, payments made before the due date were not "on

account of an antecedent debt" under section 547(b) and could therefore not be avoided as preferential transfers.[11]

Similarly, a number of courts have held that severance payments made upon termination were not made "on account of an antecedent debt" within the meaning of section 547(b).  In *Southmark Corp. v. Marley* (*In re Southmark Corp.*), the Fifth Circuit held that "[the debtor] incurred its debt [for the severance payment] to Marley at the time it terminated him."  62 F.3d 104, 106 (5th Cir. 1995).  The court first cited the standard that "[a] debtor incurs a debt when he becomes legally obligated to pay it."  The court then reasoned that "[u]nder the Code, a party to an executory contract has a claim against the debtor only when the debtor has rejected the contract.  Consequently, a debtor who breaches an executory contract incurs a debt only at the time of breach."[12]  *Id.*  Accepting the lower court's factual finding that termination and payment occurred contemporaneously, the court therefore concluded that the payment was not on account of an antecedent debt.  The courts in *Intercontinental Publications, Inc. v. Perry* (*In re Intercontinental Publications, Inc.*), 131 B.R. 44 (D. Conn. 1991), and *G.G. Survivor Corp. v. Harari* (*In re G.G. Survivor Corp.*), 217 B.R. 433 (Bankr. S.D.N.Y. 1998), likewise held that the debt for severance pay arose on the date of termination.[13]  While none of these decisions discuss the issue in terms of due dates, they are clearly expressing the same rationale and conclusions as

---

[11] It is important to emphasize here the exact conclusion the court in *David Jones Builder* reached.  The cases just discussed concerned term payments made after the due date, and those courts accepted that the payments had been made on account of an antecedent debt.  In contrast, the court in *David Jones Builder* confronted payments made before the due date and concluded that the debt was not yet incurred on the date of payment.  Instrumentally, the consequences are the same: in both the cases just discussed and in *David Jones Builder*, the term payments were held to not be avoidable.  However, the legal conclusions are quite distinct.

[12] It is not clear to the Court why the Fifth Circuit in *Southmark* considered federal law in determining when the debt was incurred for purposes of section 547(b).  Clearly, state contract law created the cause of action for severance payments at issue in *Southmark.*, and the termination was not a breach of the severance contract, but rather the condition precedent to maturation of the debtor's severance obligation.

[13] It should be noted that though the court in *Intercontinental Publications* held that the debt arose upon termination, it rejected at the same time the argument that debt arose on the due date for each of the installment payments.  Thus, the court held that the payment made contemporaneously to termination could not be avoided, while it also held that periodic payments made after termination could be avoided.

the section 547(c)(2) cases discussed above.  In the absence of the sort of installment plan as

found in *Intercontinental Publications*, severance payments are due on the date of termination;

on that date, the terminated employee gains an enforceable right to payment.  Thus, these courts

similarly focused on the point in time at which the creditor gains the right to demand payment.

 Whalen asserts that these cases demonstrate that a debt is not incurred for purposes of

section 547(b) until payment is due.  If that is correct, it is clear that the Baxter Transfer was not

made "on account of an antecedent debt."  The February 2001 Bonus did not become due until

February 1, 2001, and thus no debt would be incurred until that date.  As Whalen argues,

"Because Enron Corp. was not yet obligated to pay the [February 2001 Retention Bonus on

January 31, 2001], Cliff Baxter had no enforceable right to payment. …Thus, the transfer of the

[Baxter Transfer] was not on account of an antecedent debt…."  *Defendant's Response*, at 12.

However, later courts considering the issue, particularly courts analyzing the issue under section

547(b), have overwhelmingly rejected the conclusion that a debt is incurred when payment is

due.

 A number of courts have specifically rejected the conclusion, expressed in *Iowa Premium*

*Service*, that interest debt is incurred as it becomes due and payable, favoring, rather, the view

that interest, like principal, is incurred on the date the loan is made.  *See, e.g., Lingley v. Stuart*

*Shaines, Inc.*, 50 B.R. 734, 741 (D. Maine 1985) ("It seems clear to this Court, as it did to the

three dissenters in *Iowa Premium Service*, that [the obligation to pay interest] occurs when the

debtor accepts the money from the lender.") (considering section 547(c)(2)); *Western World*

*Funding, Inc., et al. v. Allred* (*In re Western World Funding, Inc.*), 54 B.R. 470, 480 (Bankr.

D.Nev. 1985) ("the obligation to pay both principal and interest was incurred for the purpose of

section 547(b)(2) [when the promissory notes were executed].") (also reaching the same

conclusion regarding section 547(c)(2)).  The Ninth Circuit subsequently called *Iowa Premium*

*Service* into serious doubt and limited its holding to prepayable promissory notes.  *CHG Int'l,*

*Inc. v. Barclays Bank* (*In re CHG Int'l, Inc.*), 897 F.2d 1479, 1486-87 (9th Cir. 1990).  The court

concluded that "the obligation to pay interest arose when CHG received the loan, not when the

interest payments were due."  *Id.*  Similarly, after a thorough review of the case law, legislative

history, and relevant commentary, the court in *AERFI Group plc v. Barstow* (*In re MarkAir, Inc.*)

held that the debt for rent was incurred for the purposes of section 547(b) when the leases were

executed.  240 B.R. 581, 592 (Bankr. D.Alaska 1999).  The court distinguished *Mindy's* and

subsequent decisions under section 547(c)(2), suggesting that a distinct analysis might be

required for each provision and hinting that those decisions should be read in light of the

enactment and subsequent elimination of the forty-five day requirement in section 547(c)(2)

discussed previously.  *Id.* at 593-608.  The court also explicitly disagreed with those decisions

that suggested debt for rent was incurred as it came due under section 547(b).  *Id.* at 607-8.

More importantly, the case law reveals an obvious trend interpreting "antecedent debt"

broadly and rejecting the proposition that debt is only incurred as it becomes due.[14]  Courts

considering payments made under purchase and sales contracts have consistently held that the

debt was incurred at the inception of the agreement, contra *Gold Coast Seed*.  *See, e.g., Danning*

*v. Bozek* (*In re Bullion Reserve of North America*), 836 F.2d 1214, 1218 (debt incurred when

creditor transferred funds for bullion purchase, even though bullion was subsequently transferred

to creditor on demand, and thus, the creditor suffered no injury); *HLI Creditor Trust v.  Hyundai*

*Motor Co.* (*In re Hayes Lemmerz Int'l, Inc.*), 329 B.R. 136, 141 (Bankr. D.Del. 2005)

("Although the second payment was not due until delivery, the Debtors became legally obligated

to pay the purchase price of the machines when they ordered them subject only to the satisfaction

---

[14] Unless otherwise indicated, the following decisions interpret section 547(b)(2).

of the condition precedent that the machines be delivered.").  *See also Boone v. Marlatt* (*In re Day Telecomm., Inc.*), 70 B.R. 904, 909 (Bankr. E.D.N.C. 1987) ("The debt may actually have been incurred when the debtor signed the employment agreement in 1985 requiring it to pay [the employee]'s legal expenses, rather than at the time the legal services were performed.").  Though these courts applied the "legally obligated to pay" standard, they concluded that the legal obligation arose not with a specific cause of action – such as when the agreement was breached or payment due – but when a contingent, even remote, cause of action arose; that is, when the agreement was made.  The repudiation of the "due" standard was made clear by the Fourth Circuit in *Sigmon v. Royal Cake Co., Inc.* (*In re Cybermech*). 13 F.3d 818 (4th Cir. 1994).  The creditor in *Cybermech* had made a partial down payment on its purchase, which payment was subsequently refunded a month later when the debtor informed the creditor that it could not perform; refund and repudiation occurred contemporaneously.  The creditor argued that there was no antecedent debt, as payment was made at the time the obligation to pay arose.  The court rejected this argument, stating, "The fact that Royal did not have a cause of action against Cybermech until [the date of repudiation and payment] is irrelevant, because the Code does not limit definition of "claims" to actual causes of action.  Cybermech also incurred a debt on [the date the agreement was signed]…. Because the debt was incurred some three weeks before the transfer, the refund payment to Royal was plainly made "on account of an antecedent debt."[15]  *Id.* at 822.

---

[15] This Opinion does not conflict with the Seventh Circuit's conclusion in *Energy Coop., Inc. v. SOCAP Int'l, Ltd.* (*In re Energy Coop, Inc.*), 832 F.2d 997 (7th Cir. 1987), a case decided under section 547(c)(2).  In that case, the court concluded that "[the debtor] incurred a debt to [the creditor] when [the debtor] repudiated the contract on March 11," which is expressly the position the court in *Cybermech* rejected.  *Id.* at 1002.  However, the court in *Energy Coop* did not exclude the conclusion that the debt was incurred on the date the agreement was made, as the same result was reached by concluding that the debt was incurred on the date of breach.  It noted, however, that former conclusion would conflict with the Eighth Circuit's holding in *Iowa Premium Service* and the Ninth Circuit's holding in *Gold Coast Seed*.

The range of contingent claims that have been recognized to create an antecedent debt is demonstrated by two groups of cases concerning settlement payments and loan payments made by a guarantor. Generally, the former group involved prepetition transfers made in satisfaction of negotiated settlements to lawsuits and made contemporaneously to the execution of those settlements. *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 88 F.3d 311 (5th Cir. 1996); *Peltz v. Vancil* (*In re Bridge Inform. Services, Inc.*), 302 B.R. 41 (Bankr. E.D.Mo. 2003); *Bioplasty, Inc. v. First Trust Nat'l Assoc.* (*In re Bioplasty, Inc.*), 155 B.R. 495 (Bankr. D.Minn. 1993); *New York Credit Adjustment Bureau, Inc. v. Just In-Materials Designs, Ltd.* (*In re Vasu Fabrics, Inc.*), 39 B.R. 513 (Bankr. S.D.N.Y. 1984). The settling parties argued that the transfers were not "on account of an antecedent debt" within the meaning of section 547(b) because no debt arose until execution of the settlement agreements. The courts disagreed, holding that the debt on account of which the settlement payments were made arose at the time of the actions giving rise to the settled claim. As the court in *Bioplasty* reasoned, "The actions that gave rise to the class action gave the class action plaintiffs a right to pursue damages against Bioplasty. Even though any ultimate right to payment was disputed, contingent, unliquidated, and not reduced to judgment, such right still constitutes a claim under the Bankruptcy Code, and 'where a claim exists, so does a debt.'" 155 B.R. at 498 (citing *Energy Coop.*, 832 F.2d at 1002). *See also Vasu Fabrics*, 39 B.R. at 517 ("The Just In debt was clearly antecedent at the time of the settlement, as the debt was necessarily based on events prior to the filing of the District Court Action some ten months previously."). It should be noted that the settlements here contained general denials of the settled claims. Thus, the claims, and by extension debts, on account of which the settlement payments were made were disputed even as to their validity in fact and law, and not merely contingent on the occurrence of some future event.

An arguably even more expansive interpretation of "antecedent debt" can be found in two cases considering prepetition payments made by the debtor as guarantor on loans for corporate officers. *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588 (11th Cir. 1990); *Tidwell v. AmSouth Bank, N.A.* (*In re Cavalier Homes of Georgia, Inc.*), 102 B.R. 878 (Bankr. M.D.Ga. 1989) (considering the issue under section 548(d)(2)(A), which, as applicable to the fraudulent conveyance provisions of 548, defines 'value' in relation to an 'antecedent debt'). In neither instance was the guaranteed loan in default; that is, though the debtor made payments on the loan, in neither case were they obligated to do so as guarantors. Nonetheless, the courts concluded that the payments were made on account of a contingent antecedent debt incurred at the creation of the guarantee. "[The debtor]'s payments on [the loan] were obviously made in anticipatory satisfaction of its contingent obligation to ABC under the guarantee agreement; that the payments were clearly intended to help *prevent* [the officer] from defaulting and thereby *forestall* 'maturation' of the guarantee obligation does not render them any less 'for or on account of' that debt." *Chase & Sanborn*, 904 F.2d at 595. Thus, these courts not only rejected the limited "due" standard; they held that a debt was antecedent even though the creditor possessed a right to payment and contingent cause of action directly against another party. If any party was "legally obligated to pay," it was much more obviously the borrower.

The Court would be willing to conclude on the basis of the case law alone that the Baxter Transfer was made "on account of an antecedent debt" for the purposes of section 547(b). The Court believes decisions such as *CHG* and *Hayes Lemmerz* are sufficiently analogous to support the conclusion that the debt for which the Baxter Transfer was made was incurred when the Employment Agreement was signed. However, the Court would instead prefer to return to the point made at the beginning of this discussion, namely that the dispute regarding whether Enron

was "legally obligated to pay" the Baxter Transfer is largely irrelevant to the analysis of whether

the Baxter Transfer was made "for or on account of an antecedent debt" under section 547(b).

The six cases just discussed highlight this fact.  It is difficult to reconcile those decisions with

any fair reading of the phrase "legally obligated to pay;" in the settlement cases, the claims were

not even established as legally valid claims asserting valid legal obligations, while in the

guarantee cases, the legal obligation to pay rested more accurately with another party.

Nonetheless, each of the courts held that the transfers were on account of remotely contingent

debts, with which conclusions the Court concurs.  Not surprisingly, none of them cited to or

applied the "legally obligated to pay" standard.  Rather, all anchored their conclusions in the

statutory text, and more specifically, the definitions of "debt" and "claim" in section 101(5)(A)

and 101(12).

ii. Statutory Analysis

        "Debt" is defined in section 101(12), which states "debt means liability on a claim."

"Claim" is itself defined in section 101(5)(A) as "a right to payment, whether or not such right is

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured."  It is well settled that "claim" and "debt" are

synonymous, such that whenever a "claim" arises, a "debt" necessarily arises as well; the only

distinction between the two terms is the party to which it applies.  *See Penn. Dept. of Public

Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130 (1990) ("This definition reveals

Congress' intent that the meanings of 'debt' and 'claim' be coextensive.').  The definition of

"debt" can therefore be restated as "a liability for payment, whether or not such liability is

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured."

Having established the definition of debt, the next issue obviously concerns its use in section 547(b).  Section 547(b) is grammatically structured such that "antecedent" modifies "debt", and the compound concept "antecedent debt" is in turn modified by the phrase "owed by the debtor before the transfer was made."[16]  Thus, proceeding logically, the definition of "antecedent debt" must first be established.  As "antecedent debt" is not itself defined by the Code, it cannot be defined without reference to the definition of "debt."[17]  "Antecedent" as an adjective means "going before; preceding."  American Heritage Dictionary of the English Language (4th Ed. 2000).  Thus, an "antecedent debt" is a debt that preceded some event, occurrence, condition, etc.  That event is, of course, the transfer.  This only, however, rephrases the operative question: what does it mean for a debt to be antecedent to, or precede, the transfer?  Substituting the definition of debt, an antecedent debt exists when "the liability for payment" precedes the transfer.  It is at this point that a major difficultly becomes obvious.  Under customary rules of statutory construction, "antecedent debt" and "debt" should not be interpreted in such a way as to make them synonymous.  However, it is at the same time difficult to imagine a payment made "for or on account of" a debt, but not an antecedent debt.  Simply, if the payment was made "for or on account of" a debt, it appears necessarily true that the debt precede the payment.

---

[16] If both "antecedent" and "owed by the debtor before the transfer was made" were intended to directly modify "debt", the sentence would have been written in the general form "for or on account of a debt antecedent to such transfer and owed by the debtor before such transfer was made."  Alternatively, if "owed by the debtor before the transfer was made" was intended to modify debt directly, and if that compound concept was intended to be modified by "antecedent" in turn, the sentence would have been written in the general form "for or on account of a debt owed by the debtor before such transfer was made, which was antecedent to such transfer."

[17] That is, while it is hypothetically possible that "antecedent debt" is a distinct concept from "a debt that is antecedent", such that the definition of "antecedent debt" is not delineated in any way by the Code's definition of "debt," the absence of a separate definition for "antecedent debt" in the Code suggests in the strongest terms that this is not the case, as the courts would have to independently define "antecedent debt" with only limited, inferential, guidance from Congress.

However, practical experience demonstrates that there are indeed transfers for or on account of debts that had not yet arisen, even contingently, before the transfer was made: namely, contemporaneous exchanges.  In a contemporaneous transaction, such as a cash transaction, the "liability for payment" arises at the exact instant that payment is made.  Neither liability nor payment precedes the other for the simple reason that the relationship between the parties, the transaction, is predicated on each parties' demand that there be a simultaneous exchange.  Thus, while contemporaneous transactions are payments on a "debt" under the Code, they are not made "for or on account of an antecedent debt." [18, 19]

The same problem arises, however, in light of the final element of section 547(b), that the transfer had been "owed by the debtor before such transfer was made."  If an antecedent debt is defined as a debt that arose prior to payment, the phrase "owed by the debtor before such transfer was made" appears superfluous.  One solution to this apparent problem is immediately obvious: while debt is defined as a liability for payment that may be contingent, unmatured, disputed, unliquidated, etc., the language that the antecedent debt be "owed" before transfer may be argued to limit the application of section 547(b) to a subset of debts.  This limitation may be narrowly construed to only apply to contingent debts, or it may be broadly construed to apply to all debts not matured, fixed, or reduced to judgment.

However, the better alternative is to focus not on the concept "owed" but on the phrase "by the debtor."  The phrase "owed by the debtor before the transfer was made" thus does not express a temporal concept like the phrase "antecedent debt", or a legal concept like "legally

---

[18] It is important to recognize that the Code does not define debt in relation to credit.  Thus, whereas one would not typically speak of a debt in a contemporaneous exchange, for the simple reason that no credit is extended, such exchanges do create debts under the Code.

[19] This conclusion does not render the "contemporaneous exchange for new value" defense provided for in section 547(c)(1) superfluous itself.  That provision protects both contemporaneous exchanges and *substantially* contemporaneous exchanges.  Moreover, section 547(c)(1) requires in addition that the parties had intended to make a contemporaneous exchange.

obligated to pay", but rather a concept of identity.  Only those transfers on account of an

antecedent debt owed by the debtor are subject to avoidance under section 547(b); transfers on

account of an antecedent debt owed by a third-party are not.  *Breeden v. L.I. Bridge Fund, LLC*

(*In re The Bennett Funding Group, Inc.*), 220 B.R. 739, 742 (2nd Cir. BAP 1998); *Western

World*, 54 B.R. at 478.  Under this interpretation, the word "owed" is the verb form of the

concept "liability for payment" and is coterminous with the noun "debt."  Thus, for example, a

payment by the debtor of an affiliated entity's debt would not be a preference unless the debtor

was in some fashion liable for that debt, as would be the case where the debtor guarantees the

affiliate's debt in case of default.  In all other cases, the transfer would not be a preference,

though it would likely be a fraudulent conveyance.

Thus, the Court concludes from a textual analysis that section 547(b) applies to transfers

on account of debts which precede and are not contemporaneous with the transfer, and for which

the debtor is liable, whether that liability is matured, contingent, disputed, *et cetera*.[20]  The Court

also concludes that the Baxter Transfer was made "for or on account of an antecedent debt owed

by the debtor before the transfer was made" within the meaning of section 547(b).  While, as

Whalen notes, Baxter did not have an enforceable right to payment at the time the Baxter

Transfer was made, he clearly did have an unmatured right to payment that preceded the Baxter

Transfer.  A "debt" was created at the time the Agreement was signed, and as that debt preceded

the Baxter Transfer, the Baxter Transfer was made "for or on account of an antecedent debt."

---

[20] This conclusion is similar to the standard offered in *Smith v. Creative Fin. Mgmt., Inc.* (*In re Virginia-Carolina Fin. Corp.*), 954 F.2d 193 (4th Cir. 1992).  In that case, the Fourth Circuit stated, "A common sense approach for determining whether a loan repayment is 'for or on account of an [antecedent] debt owed by the creditor' is to consider whether the creditor would be able to assert a claim against the estate, absent the [transfer]."  *Id.* at 197. *See also, Bennett Funding*, 220 B.R. at 742 ("We believe that the common sense approach suggested by the Fourth Circuit Court of Appeals in *[Virginia-Carolina Financial]* should be utilized in determining … whether a loan repayment is 'for or on account of an antecedent'…").  The key difference between that standard and the Court's conclusion concerns the distinction between antecedent debts and debts.  Absent the transfer, a party to a contemporaneous exchange would have a claim.  However, as discussed, the transfer would not have been on account of an *antecedent* debt.

Moreover, Baxter held his right to payment as against Enron, and therefore, the debt was "owed

by the debtor before the transfer was made." That the Baxter Transfer was made one day before

the obligation matured and became due is thus not relevant.

## B. PREFERNTIAL TRANSFER – NEW VALUE DEFENSE

In the Motion, Whalen also asserts that she is entitled to judgment as a matter of law in

her favor on her asserted "new value" defense to the Committee's preference action under

section 547. Section 547(c)(4) provides that the trustee may not avoid a transfer "to or for the

benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for

the benefit of the debtor (A) not secured by an otherwise unavoidable security interest; and (B)

on account of which new value the debtor did not make an otherwise unavoidable transfer to or

for the benefit of such creditor." As previously noted, Baxter provided services to Enron under

the terms of the Consulting Agreement from May 1, 2001, the date of his resignation as Vice

Chairman and Chief Strategic Officer, until November 1, 2001. Per that agreement, Baxter was

entitled to monthly payment of $250,000, plus expenses; however, no such payments were from

June until the termination of the Consulting Agreement. Whalen argues that Baxter thus

provided "new value" to Enron in the amount of $1,250,000, which remains unpaid.[21] As the

Baxter Transfer was for an amount less than that unpaid new value, Whalen concludes, she is

entitled to summary judgment in her favor on the Committee's preference claim.

The Committee argues in response that Whalen has not established what services Baxter

provided Enron from June through November 2001 nor the value of those services. The

---

[21] In her discussion of the new value defense, Whalen relates the value of services Baxter provided Enron following the due date of the February 2001 Retention Bonus, including, in addition to the services just discussed, Baxter's services as Vice Chairman and Chief Strategic Officer until May 1, 2001, and Baxter's services as a consultant during May 2001. Whalen thus suggests that Baxter provided new value in the aggregate amount of $2,026,668.68, of which she asserts $1,250,000 remains unpaid. However, the only "new value" relevant to an affirmative defense under section 547(c)(4) is any new value that remains unpaid. Thus, the Court will only consider the services Baxter provided as a consultant from June through November 1, 2001, and for which payments has not been made.

Committee contends that Whalen cannot simply rely on the Consulting Agreement, as the

Consulting Agreement only details the services Baxter was expected to provide and the expected

value of those services.  The Committee notes that Whalen bears the burden of proof on this

issue and concludes that a genuine issue of material fact exists sufficient to preclude summary

judgment in Whalen's favor on this issue.

In rebuttal, Whalen argues that the contractual terms are sufficient to establish the amount

of "new value" Baxter provided to Enron.  Whalen cites to a number of decisions holding that

employees are presumed to have provided services equal to their wages for purposes of section

547(c)(4).  *See Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Area Pension*

*Fund* (*In re Jones Truck Lines, Inc.*), 130 F.3d 323, 328 (8th Cir. 1997) ("the value of employee

services is presumed to equal the wages and benefit the employer contracted to pay").  Whalen

contends that the Committee has not introduced evidence sufficient to overcome that

presumption.

The Court concludes that a genuine issue of material fact exists and that Whalen therefore

is not entitled to summary judgment on this matter.  While the Court agrees that contractually-

agreed upon payments can generally be presumed to equal the value of the services (or goods)

provided, sufficient facts here exist to rebut that presumption.  As the Committee notes, Baxter

was a member of Enron's senior management just prior to signing the Consulting Agreement;

this is not slander, as Whalen protests, but simply a recognition that the Consulting Agreement

was signed on the same day that Baxter resigned as Vice Chairman and Chief Strategic Officer.

Moreover, the Court notes that Baxter's monthly fees under the Consulting Agreement were

nearly six times his monthly wages under the Employment Agreement.  In contrast, the

employees in *Jones Truck Lines* were unionized laborers, subject to a collective bargaining

27

agreement, while cases like *Gonzalez v. Nabisco* (*In re Furr's Supermarkets, Inc.*), 317 B.R. 423,

432 (10th Cir. B.A.P. 2004), also cited by Whalen, concern trade contracts for the sale of goods

and commodities.  In neither of the latter circumstances is there cause to discount the results of

arms' length negotiation between parties with diverging interests.  In light of the facts, the same

simply cannot be said here.  Though neither consideration is sufficient to establish that Baxter

provided less new value than Whalen asserts, both together, as well as other considerations

flowing from the totality of the circumstances, are sufficient to overcome the presumption that

the contractual payments equaled the new value provided.

C. FRAUDULENT CONVEYANCE – STATE LAW CLAIM

Finally, Whalen argues that she is entitled as a matter of law to judgment in her favor on

the Committee's state law claims.  In the third count of the Complaint, the Committee asserts its

right to recover the Baxter Transfer as a fraudulent transfer pursuant to section 544 of the Code

and sections 270 to 281 of the N.Y. Deb. & Cred. Law (the "State Law Claim").  Whalen argues

that this count is flawed as a matter of law, as 1) New York state law is inapplicable to this

proceeding, 2) the Committee failed to plead fraud with the specificity required by Rule 9 of the

Federal Rules of Civil Procedure, as incorporated by Rule 7009 of the Federal Rules of

Bankruptcy Procedure, and 3) the Committee failed to meet the minimum pleading requirements

of Fed.R.Civ.P. 8, as incorporated by Fed.R.Bankr.P. 7008, in asserting its right to recovery

under "other applicable law."  The Committee failed to respond to Whalen's argument in either

its pleadings or at oral argument.

The Court concludes that the Motion should be granted with respect to the State Law

Claim.  By failing to respond to Whalen's arguments, the Committee apparently conceded those

arguments.  Moreover, the Court agrees that New York state substantive law is not implicated in this action and that Texas state substantive should be applied instead.[22]

VII. CONCLUSION

In light of the foregoing, the Court concludes that the Motion should be GRANTED as to the State Law Claim and DENIED in all other respects.  The Committee is to settle an order consistent with this opinion.


DATED:        New York, New York
              December 13, 2006

                                        **s/Arthur J. Gonzalez**
                                        ARTHUR J. GONZALEZ
                                        United States Bankruptcy Judge

---

[22] The Court notes, however, that Whalen incorrectly cites the law in arguing that this Court should apply federal choice of law rules to resolve this issue.  Whalen cites the Ninth Circuit's decision in *Lindsay v. Beneficial Reinsurance Co.* (*In re Lindsay*) for the proposition that "[i]n federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."  59 F.3d 942, 948 (9th Cir. 1995).  The Second Circuit, however, reached the opposite conclusion in *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599 (2nd Cir. 2001).  In that decision, the court held that bankruptcy courts should apply the choice of law rules of the forum state unless a significant federal policy is implicated, and that the federal interest in national uniformity, as identified by the Ninth Circuit in *Lindsay*, is not such a significant federal policy. *Id.* at 605-07.  Nonetheless, the Court reaches the same conclusion applying New York state choice of law rules as it would applying federal choice of law rules, namely, that Texas state substantive law should applied in the instant proceeding.